secondary hypertension. Despite this notice, Interneuron and Wyeth Defendants did nothing to update the November 1995 Safety Update, or otherwise put the public, the FDA, or physicians on notice of this relationship between Redux and VHD.

75.    On April 29, 1996, irrespective of the fact that the Defendants knew of the defective nature of the Diet Drugs and despite the fact that the Defendants knew of the danger and risks of VHD, primary pulmonary hypertension and secondary pulmonary hypertension associated with the Diet Drugs, the Defendants introduced Redux into the United States market.

76.    On or about June 1, 1996, Interneuron entered into a "Co-promotion Agreement" with the Wyeth Defendants which both reaffirmed the joint venture or partnership between Interneuron and the Wyeth Defendants and provided for Interneuron to market, promote, advertise, distribute, label, detail, supply, package and/or sell Redux in consideration for the payments from Interneuron's co-promoter, Wyeth Defendants, for percentages of profit derived from sales generated by Interneuron's sales representative sales force.

77.    On or about August 28, 1996, only four months after approval of Redux, Interneuron and Wyeth Defendants were provided and reviewed a study entitled "Cardiac Adverse Effects of Fenfluramine Isomers" prepared by Dr. Francis Wagniart of Servier revealing a higher incidence among Redux users of PPH than was previously known. The findings further established Interneuron and Wyeth Defendants' knowledge of serious adverse side effects caused by the ingestion of the Diet Drugs. However, Interneuron and Wyeth Defendants failed to act responsibly in taking necessary action to protect the public, including Plaintiffs, from Diet Drug related injuries.

28

78.    In March 1997, the Defendants were informed by doctors of heart valve problems among users of the Diet Drugs when they received a detailed report from physicians in meetings at the Mayo Clinic in Rochester, Minnesota. However, Defendants failed to undertake any action to warn or otherwise prevent further injury to the consuming public including Plaintiffs.

79.    In July of 1997, the Mayo Clinic discovered additional cases of damage to heart valves caused by the Diet Drugs and made this additional information known to Defendants.

80.    On or about July 8, 1997, the Mayo Clinic in Rochester, Minnesota released an emergency report linking the use of the Diet Drugs to unusual, potentially life-threatening disease related to heart valves.

81.    Independent medical center data from the Mayo Clinic and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who used the drug. The Mayo Clinic study concluded that dexfenfluramine users needed to be informed about the risk of PPH and VHD.

82.    Notwithstanding the fact that Interneuron and the Wyeth Defendants received detailed reports during separate meetings with investigators from the Mayo Clinic and the MeritCare Medical Center in Fargo, North Dakota regarding these findings as early as March of 1997, four months before the *New England Journal of Medicine* article reporting these findings was published, Interneuron and the Wyeth Defendants did nothing to halt the wide spread use of the Diet Drugs until September of 1997.

83.    On July 8, 1997, the FDA issued a public health advisory regarding the use of the Diet Drugs which stopped the implementation of the DEA's administrative action relating to de-scheduling.

84.     On or about September 15, 1997, the FDA forced Defendants to withdraw the Diet Drugs from the United States market because the independent medical center data from the Mayo Clinic in Rochester, Minnesota, and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who took the Diet Drugs alone or in combination with phentermine ("the initial Mayo study"). In fact, of 291 patients tested, one-third of them had damaged aortic or mitral heart valves; less than 1 percent of the general population has such damage.

85.     On November 11, 1997, results of a study funded by the National Institute of Health ("NIH"), of the association between heart valve abnormalities and the use of the Diet Drugs, individually or in combination with phentermine, were reported at the annual conference of the North America Association for the Study of Obesity in Cancun, Mexico. The study, conducted by investigators at the Hennepin County Medical Center in Minneapolis, Minnesota ("the Hennepin study"), found significant heart valve leaks in 24% of 226 individuals taking one or more of these drugs.

86.     On November 13, 1997, officials from the FDA, NIH and the Centers for Disease Control issued a joint recommendation for medical monitoring of users of the Diet Drugs.

87.     Notably, the Hennepin study included a control or comparison group of 81 people matched by age, sex, height, and weight to the 226 cases. The 226 cases took fenfluramine and/or dexfenfluramine, while the 81 controls did not. Only 1% of the controls had significant heart valve leaks. All 307 individuals in the Hennepin study (cases and controls) had echocardiograms, which were read by physicians who were "blind" as to the status of each individual, i.e., the reading physicians had no knowledge as to whether the person had taken the

diet drugs or not. The Hennepin study investigators found that dexfenfluramine ("Redux") is as likely to lead to heart valve defects as fenfluramine. Of the 226 patients observed in the Hennepin study, 145 had taken the combination of fenfluramine and phentermine, 40 had taken dexfenfluramine, 27 had taken dexfenfluramine in combination with phentermine, and 14 had taken all three drugs.

## General Allegations

88.    At all times material hereto, Defendants researched, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold pharmaceutical Diet Drugs which were defective and unreasonably dangerous to consumers, including Plaintiffs.

89.    Defendants knew or should have known that the Diet Drugs, when used alone or in combination with phentermine, created significant risks of serious injuries or disorders, including primary and secondary pulmonary hypertension, related cardiopulmonary dysfunction, cardiomyopathy, congestive heart failure, valvular regurgitation, neurotoxicological injury and/or death, as to which Defendants failed to make proper, reasonable or adequate warning to the public about the risks associated with the use of their products.

90.    At all times material hereto, though Defendants knew or should have known that dangerous risks were associated with the use of the Diet Drugs, Defendants proceeded to or permitted the Diet Drugs to be assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold without adequate warnings of the serious side effects and dangerous risks.

31

91.    Both during the initial submission of the Redux NDA and thereafter, Interneuron and the Wyeth Defendants, intentionally withheld, mischaracterized and actively misrepresented reports and information in its possession which related directly the risk of pulmonary hypertension or valvular regurgitation. Interneuron and the Wyeth Defendants thereby misled the public, the FDA, the medical community and Plaintiffs, resulting in Plaintiffs having received no or inadequate warnings regarding the true risks associated with ingesting Redux.

92.    Interneuron and Wyeth Defendants failed to conduct sufficient and adequate pre-marketing research and testing to properly determine the risks and severity of serious side effects including valvular regurgitation and/or pulmonary hypertension caused by the ingestion of Diet Drugs which Interneuron and Wyeth Defendants knew or should have known about.

93.    Interneuron and Wyeth Defendants failed to conduct sufficient and adequate post-marketing surveillance as to the ingestion of Diet Drugs and resultant adverse events and side effects to both properly determine and quantify the risks and severity of serious side effects and take reasonable and necessary remedial action to protect the public, including Plaintiffs, from injuries being suffered by Diet Drug users which Interneuron and Wyeth Defendants knew or should have known about.

94.    Defendants failed to properly and adequately warn Plaintiffs, both directly and by and through Plaintiffs' prescribing physicians, of the dangers associated with Redux such that Plaintiffs' prescribing physicians did not have available to them the body of knowledge that an adequate warning from Interneuron would have communicated to Plaintiffs' prescribing physicians.

32

95.    As a result of Defendants' acts and omissions and other wrongful conduct more fully detailed and alleged herein, Plaintiffs have sustained significant injuries.

96.    Interneuron and Wyeth Defendants undertook an intentional course of action and marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs by falsely misleading potential users about the products, by suppressing material facts, and by failing to warn users about the serious health effects which Interneuron and Wyeth Defendants knew or should have known could result from the use of the subject drugs. The product warnings in effect during the time the Diet Drugs were prescribed were non-existent or inadequate as to the need to alert prescribing physicians and consumer patients of the actual adverse health risks associated with these drugs, which risks were then known (or should have been known) to the Interneuron and Wyeth Defendants.

97.    This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently sought to create the impression and to convey to Plaintiffs and others on whom Plaintiffs would rely, that the use of the Diet Drugs alone or in combination with phentermine was safe and had fewer adverse health and side effects than was actually known to Interneuron and Wyeth Defendants at the time they made these representations.

98.    Interneuron and Wyeth Defendants undertook a promotional campaign that included the funding of and/or placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of the Diet Drugs in order to induce widespread use of the products. Many of these articles either cited or reported the results of false and/or substantially flawed studies funded by the Interneuron and Wyeth Defendants.

33

99.    Interneuron and Wyeth Defendants actively encouraged, or failed to effectively discourage, the widespread prescribing of the Diet Drugs alone or in combination with phentermine to patients that were not clinically obese through contracted, commission based salespersons employed by Interneuron and Wyeth Defendants.

100.    The marketing program as a whole, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of the Diet Drugs, both individually and/or in combination with phentermine, was safe for human use, had fewer side effects and adverse reactions than other methods of weight loss, constituted a convenient, safe form of weight loss and would not interfere with daily life.

101.    Interneuron and Wyeth Defendants purposefully downplayed and understated the health hazards and risks associated with the Diet Drugs.

102.    Interneuron and Wyeth Defendants falsely and fraudulently concealed relevant information from doctors and potential Diet Drug users regarding the safety of the Diet Drugs.

103.    Interneuron and Wyeth Defendants' marketing efforts as well as Defendants' product inserts, falsely, fraudulently and negligently misrepresented a number of facts regarding the Diet Drugs, including the following:

a)  The presence of adequate testing of the Diet Drugs;
b)  Diet Drugs' efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs; and
c)  The relative risks associated with the Diet Drugs including the prevalence of pulmonary hypertension and primary pulmonary hypertension.

104.    Defendants did not adequately or appropriately disclose the Diet Drugs information or related drug information to physicians in the United States, including Plaintiffs' physicians. Rather, Defendants continued to act in consort in the placement of the Diet Drugs

34

into the stream of commerce after learning of the extreme dangers associated with the Diet

Drugs and while knowing the Diet Drugs had no beneficial use.

105.    At all times relevant hereto, the Defendants' labeling on the Diet Drugs were

totally inadequate to alert Plaintiffs, prescribing physicians and others of PPH, VHD and/or

secondary pulmonary hypertension and other dangers and risks associated with Diet Drug usage.

Instead the Interneuron and Wyeth Defendants fraudulently concealed these dangers from

physicians. As a result, physicians have over-prescribed the Diet Drugs to patients who were

grossly under-informed regarding the risk of secondary pulmonary hypertension or PPH

associated with the drugs.

106.    Interneuron and Wyeth Defendants fraudulently concealed, destroyed and

removed written evidence and/or intentionally misrepresented evidence supporting the

association between secondary pulmonary hypertension and/or PPH with the Diet Drugs.

107.    At all times relevant to this cause, Interneuron and Wyeth Defendants also knew

or should have known of many other studies, regulatory actions and concerns, incidences of

injury and/or death, concerns about the subject drugs, safety among scientists, researchers,

regulators and other knowledgeable professionals, the dangers of drug combinations, meetings

among pharmaceutical industry officers, executives or employees (including Defendants),

internal memos and reports of health concerns regarding the subject drugs, the desire of

Defendants to stop or delay regulatory action regarding the subject drugs, the lack of sufficient

safety studies before and during marketing of the subject drugs, the contents of Defendants' own

files, plans and reports, the danger of the off-label use of medications, the desire of Defendants

to maximize profits despite safety concerns, safety concerns about the drugs which could block

35

or change FDA approval, regulatory actions, reports of injury and concerns about the subject

drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in

the warning and labels required on these products and the plans and actions of Defendants to

fight such changes (including supplying regulators with false or misleading information),

warning labels on the products designed so that they would be overlooked by physicians and

users such as Plaintiffs, statements by medical professionals regarding safety concerns for the

subject drugs, the fact that phentermine is an MOAI drug which would be contra-indicated for

usage with fenfluramine and dexfenfluramine, prevalent usage of unsafe combinations of the

subject drugs (as promoted by Interneuron and Wyeth Defendants) and adverse effects reported

therefrom, the failure of Defendants to report incidences of PPH resulting from the use of the

subject drugs to regulators and health care professionals, false information provided by sales

representatives and others concerned with advertising and promoting the subject drugs, efforts to

derail regulatory review and oversight of the subject drugs, the identification of groups most at

risk of injury, the misrepresentation and concealment of reports regarding adverse health effect

of the Diet Drugs by Interneuron and Wyeth Defendants from regulators and health care

professionals, and many other material facts regarding the Diet Drugs and which would have

shown the danger and adverse health effect of using the subject drugs. Nevertheless, Defendants

did suppress, misrepresent and failed to inform Plaintiffs, the public at large, or physicians of

these material facts and risks, and did encourage and promote unsafe usage by Plaintiffs and

others.

108.    Defendants, having undertaken the manufacture, sale, marketing, distribution and

promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state

regulators and others upon whom it was known, or should have known, by Defendants that

Plaintiffs would rely, accurate and complete information regarding the subject drug products.

Nevertheless, Defendants misrepresented these facts, and failed to inform and did conceal from

Plaintiff, the public at large, and physicians of the material facts and risks of using the subject

drugs.

109.    Interneuron and Wyeth Defendants fraudulently represented to Plaintiffs,

Plaintiffs' physicians, state regulators and others upon whom it was known, or should have been

known that each Plaintiff would rely, that the Diet Drugs were safe and effective, that the

benefits of taking the subject drugs outweighed any risks and misrepresented and concealed

safety and effectiveness information regarding its products including but not limited to the

propensity to cause serious physical harm when used alone and in combination. The continuous

and ongoing course of action constituting fraud and misrepresentation upon Plaintiffs started as

early as 1993, if not earlier, and continued through repeated acts and non-disclosure every year

since then, in the State of Massachusetts and in those States in which the Plaintiffs resided, were

prescribed and ingested the Diet Drugs, throughout the United States, and elsewhere.

110.    Interneuron's and Wyeth Defendants' fraudulent misrepresentations took the form

of, among other forms, express and implied statements, publicly disseminated misinformation,

misinformation provided to state regulatory agencies, inadequate, incomplete and misleading

warnings about the subject products, failure to disclose important safety and injury information

regarding the products while having a duty to disclose to Plaintiffs and others such information,

and elaborate marketing, promotional, and advertising activities designed to conceal and mislead

regarding the safety of the subject products.

37

111.    The Diet Drugs were in fact unsafe, and the use of the Diet Drugs posed an unreasonable risk of injury and death that outweighed the purported benefits of their use, such that injury was in fact caused to Plaintiffs and others.

112.    Defendants, individually and jointly, failed to adequately warn Plaintiffs and those whom they knew Plaintiffs would rely of the hazards associated with the use of the Diet Drugs and conspired to conceal and did conceal this knowledge from Plaintiffs and others. As a result of this failure to warn, Plaintiffs were caused to suffer injuries and damages.

113.    Although Defendants knew or should have known that dangerous risks were associated with the use of the Diet Drugs, alone or in combination with phentermine, Defendants proceeded to or permitted the same to be assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold without adequate warnings of the serious side effects and dangerous risks. Defendants knew of and encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been tested by appropriate clinical trials.

114.    The Diet Drugs were defective and unreasonably dangerous when they left the possession of Defendants in that, among other ways:

   a.  the Diet Drugs caused injury to the user far beyond any warned, noticed, expected or reasonable side effect or adverse reaction and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;
   b.  when placed in the stream of commerce the Diet Drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss;

38

    c.  the Diet Drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of injury and death by VHD, PPH and/or pulmonary hypertension;

    d.  the Diet Drugs were insufficiently tested;

    e.  there were insufficient instructions on the proper use of the Diet Drugs;

    f.  there were misleading advertising and promotion concerning the safety and benefits of using the Diet Drugs;

    g.  there were inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs;

    h.  the Diet Drugs had not been materially altered or modified prior to the use of said drugs by Plaintiff; and

    i.  Defendants were in the business of distributing and selling the Diet Drugs which make the basis of this lawsuit.

115.    Defendants assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold these products in a defective condition that was unreasonably dangerous to the user or ultimate consumer of this product. Each product was expected to and did reach the user and consumer Plaintiffs without substantial change in the condition at which it was sold.

116.    As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs sustained and will continue to sustain serious and permanent injuries, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life past and future; undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; and fear and mental anguish concerning future medical problems associated with their injuries.

117.    Defendants failed to take immediate and direct measures to ensure that the end users of the Diet Drugs, including the Plaintiffs and their prescribing physicians, were notified of the potential and actual hazards of the Diet Drugs.

118.    Defendants, Interneruon and Wyeth Defendants, employed, contracted, associated or otherwise engaged pharmaceutical sales persons, area account mangers, district managers, area development managers, area business directors and other representatives ("sales representatives") in furtherance of marketing, promoting, selling and/or distributing the Diet Drugs through the United States.  Interneuron and Wyeth Defendants, by and through these sales representatives, wrongfully misrepresented and concealed relevant information relating to the dangers associated with the Diet Drugs from the consuming public, including Plaintiffs and Plaintiffs' prescribing physicians.  Interneuron's and Wyeth Defendants' scheme, design, campaign, program, plan, and operation was aimed towards ensuring that "the message, the right message" reached pharmacists, hospitals, managed care organizations, prescribing physicians, including Plaintiffs' prescribing physicians, and consumers, including Plaintiffs while deliberately misrepresenting the safety and efficacy of the Diet Drugs.  During the course of their employment or other engagement with Interneuron and Wyeth Defendants, the sales representatives undertook the following both within the scope of their employment and at the instruction and/or direction of Interneuron and Wyeth Defendants: failed to convey adequate warnings to Plaintiffs through their prescribing physicians; negligently distributed, marketed, advertised and/or promoted the Diet Drugs; made negligent misrepresentations regarding the safety and efficacy of the Diet Drugs; negligently failed to provide sufficient instructions to Plaintiffs and/or their prescribing physicians regarding the use of said drugs; made false and

40

fraudulent misrepresentations to physicians and staff, with the intent that these statements be

relied upon to the detriment of patients, including Plaintiffs, including but not limited to: that the

Diet Drugs were safe and effective when used as directed, and that the Diet Drugs were effective

for long term weight loss. Moreover, Interneuron and Wyeth Defendants, by and through their

sales representatives downplayed the true risk of serious cardiovascular and life threatening

diseases such as VHD and PPH. Upon information and belief, these sales representative, armed

with Plaintiffs' doctors' profile consisting of personal biographical information and periodic

reports on prescribing habits, specifically discussed the importance of co-promotion of the Diet

Drugs within the Interneuron and Wyeth Defendant network and with other companies and, in a

coordinated fashion, implemented those discussions and agreements by bombarding prescribing

physicians, including Plaintiffs' physicians, with false and misleading information about the Diet

Drugs. The sales representatives were at all times relevant hereto an integral part of

Interneuron's and Wyeth Defendant's scheme, design, campaign, program, plan, and operation

aimed towards realizing profits to the detriment of consumers including Plaintiffs. As a result of

the tortious and fraudulent actions described herein by Defendants, Interneruon's and Wyeth

Defendants' sales representative agents, Interneuron and Wyeth Defendants are liable to

Plaintiffs in strict products liability, negligence, fraudulent misrepresentation, fraudulent

concealment, and unfair and deceptive trade practices, as well as those other actions pled in this

complaint.

    119.    Plaintiffs were prescribed the Diet Drugs for weight loss. Plaintiffs received no

warnings or statements regarding adverse effects of Diet Drug use which would warn Plaintiffs

against the use of such Diet Drugs or that such Diet Drugs could cause cardiovascular injuries

such as pulmonary hypertension and valvular regurgitation

## COUNT I- Breach of Warranty
### DEFECTIVE DESIGN

120.     Plaintiffs adopt by reference all of the allegations above, each inclusive, as though

fully set forth herein.

121.     At all times material hereto, Defendants engaged in the business of researching,

formulating, testing, developing, designing, licensing, assembling, compounding, marketing,

promoting, distributing, detailing, and/or selling the Diet Drugs that were defective and unreasonably

dangerous to consumers, including Plaintiffs.

122.     At all times material hereto, the Diet Drugs which were researched, formulated,

tested, developed, designed, licensed, assembled, compounded, marketed, promoted, distributed,

detailed, and/or sold by Defendants were expected to reach, and did reach, prescribing physicians

and consumers including Plaintiffs, without substantial change in the condition in which they were

sold.

123.     At all times material hereto, the Diet Drugs were in a defective and unreasonably

dangerous condition at the time it was placed in the stream of commerce in ways which include, but

are not limited to, one or more of the following particulars:

        a.       When placed in the stream of commerce, the Diet Drugs contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiffs to risks which exceeded the benefits of the drug;

        b.       When placed in the stream of commerce, Diet Drugs were defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and/or weight loss;

42

c.   Diet Drugs were insufficiently tested;
d.   Diet Drugs were marketed to be used in ways which were known to Interneuron to cause harmful side effects which outweighed any potential utility; and
e.   Diet Drugs were not safe for its intended use as a weight loss drug.

124.   But for the aforementioned defective and unreasonably dangerous conditions, the Diet Drugs would not have been prescribed to Plaintiffs, Plaintiffs would not have ingested the drugs, and Plaintiffs would not have sustained the injuries alleged herein.

125.   As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other related injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and treatment, loss of earnings and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, as well as all costs of this action.

## COUNT II- Breach of Warranty
## FAILURE TO WARN

126.   Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

127.   Diet Drugs were defective and unreasonably dangerous when it left the possession of Defendants in that Diet Drugs contained warnings which were misleading regarding the purported benefits associated with the drug and were inadequate and insufficient to alert physicians and consumers, such as Plaintiffs, to the dangerous risks and reactions associated with the drugs,

43

including, but not limited to, primary pulmonary hypertension, heart valve disorders, neurotoxicity, and other serious and life threatening side affects, especially since any weight loss experienced was transitory. Plaintiffs' injuries and losses are continuing in nature.

128.    The physicians prescribed the drug to Plaintiffs for its intended purpose, i.e., weight loss.

129.    Neither the prescribing physicians nor Plaintiffs could have discovered any defect in the drug through the exercise of reasonable care.

130.    Defendants are held to the level of knowledge of an expert in the field.

131.    The prescribing physicians did not have substantially the same knowledge as an adequate warning from the manufacturer or distributor should have communicated to the prescribing physicians.

132.    The warnings that were given by Defendants to the prescribing physicians were not adequate, accurate, or clear, and were ambiguous.

133.    Defendants actively sought to "bury" the limited warnings it did provide the doctors in the fine print of the materials it  provided to the prescribing physicians, and knowingly and intentionally failed to display those warnings prominently in order to hide from prescribing physicians and the consuming public the true risks of severe and life threatening complications which had been reported in association with dexfenfluramine, including, but not limited to, the deadly disease primary pulmonary hypertension and VHD.

134.    Defendants had a continuing duty to warn the prescribing physicians of the dangers associated with the Diet Drugs.

44

135.    As a direct and legal result of Defendants' failure to warn, Plaintiffs have sustained

serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system

and/or neurological and other physical injuries, disability, disfigurement, mental anguish, loss of

capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and

treatment, loss of earnings and loss of the ability to earn money in the future. Plaintiffs' injuries and

losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, as well as all costs

of this action.

### COUNT III
### NEGLIGENCE

136.    Plaintiffs adopt by reference all of the allegations above, each inclusive, as though

fully set forth herein.

137.    Defendants directly or indirectly, negligently and/or defectively made, created,

formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed,

promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold the Diet Drugs

throughout the United States.

138.    At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable

care in the researching, formulating, testing, developing, designing, licensing, assembling,

compounding, marketing, promoting, distributing, detailing, and/or selling of Diet Drugs.

139.    Defendants breached that duty and was negligent in its actions, misrepresentations,

and omissions toward Plaintiffs in ways which include, but are not limited to, the following:

  a.    Failure to include adequate warnings with the drugs that would alert
        physicians to the potential risks and serious side affects of the drug;

45

b.     Failure to adequately and properly test the drug before placing the drugs on the market;

c.     Failure to conduct sufficient testing of the drugs which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, primary pulmonary hypertension, neurotoxicity, and heart valve disorders;

d.     Failure to adequately warn Plaintiffs' prescribing physicians that use of the drugs should be accompanied by a professional examination and regularly scheduled follow-up examinations so that primary pulmonary hypertension, heart valve disorders and other serious side effects could be avoided or detected early;

e.     Failure to adequately warn Plaintiffs' prescribing physicians that use of the drugs carried a risk of temporary or permanent disability due to primary pulmonary hypertension, VHD, neurotoxicity, and other serious side effects;

f.     Failure to warn Plaintiffs' prescribing physicians that use of the drug carried a risk that heart surgery might become necessary to repair or replace heart valves damaged by the drug;

g.     Failure to provide adequate post-marketing warnings or instructions after Interneuron knew or should have known of the significant risks of pulmonary and/or VHD and/or cardiovascular and/or neurotoxic injury from the use of the drug;

h.     Failure to adequately warn Plaintiffs' prescribing physicians that the drug should not be prescribed for a long period of time or for use in conjunction with other weight loss drugs;

i.     Failure to warn the prescribing doctors that the use of the drug should be limited to those who specialized in the treatment of obesity;

j.     Failure to warn Plaintiffs' prescribing doctors that use of the drug should be limited to the morbidly obese and not used for cosmetic loss of weight;

k.     Failure to warn Plaintiffs' prescribing doctors that the drug would not substantially reduce weight or reduce weight for a long period of time;

l.     Failure to warn Plaintiffs' prescribing doctors that the combination use of the drug had not been studied as to safety in animals or humans;

m.     Encouraging misuse and overuse while underplaying the side effects to doctors and the public in order to make a profit from sales; and

n.     Failure to display the warnings that were provided in a manner which would properly alert the prescribing doctors as to the seriousness of the adverse events which had been reported in association with the drug.

140.     Defendants knew or should have known that Diet Drugs caused unreasonably dangerous risks and serious side effects of which Plaintiffs and the prescribing physicians would not be aware. Defendants nevertheless researched, formulated, tested, developed, designed, licensed,

46

assembled, compounded, marketed, promoted, distributed, detailed, and/or sold the drug knowing that there were safer methods and products for weight loss or weight control.

141.    But for Defendants' negligent conduct as described herein, Plaintiffs' prescribing physicians would have never prescribed Diet Drugs to Plaintiffs, Plaintiffs would not have ingested Diet Drugs and Plaintiffs would not have suffered harm from ingesting Diet Drugs.

142.    As a direct and legal result of the negligence of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or neurological system and other physical injuries; disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, as well as all costs of this action.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION & FRAUDULENT CONCEALMENT**

143.    Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

144.    To date, even in light of the existence of overwhelming scientific proof in the form of countless epidemiologic studies and other tests and/or studies, Defendant, Interneruon, still claims that "[b]ased on the results of studies to date, the incidence of cardiac valve abnormalities has been shown to be less than that suggested by the original FDA preliminary analysis.  In general, these studies have shown either no or relatively small differences, although in some cases statistically

47

significant, between the incidence of cardiac valve abnormalities, as defined by the FDA, among patients who took Redux and placebo-treated patients and that the incidence of such abnormalities among Redux patients was less than previously reported estimate." Wyeth Defendants continue to make similar claims citing studies subsidized by Interneuron and/or Wyeth Defendants for the proposition that VHD and related injuries are rare.

145.    Defendants, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of Diet Drugs owed a duty to provide complete and accurate information regarding the drug to Plaintiffs, their physicians, and anyone else Defendants knew or should have known would ingest or prescribe the drug. Nevertheless, Defendants misrepresented material facts regarding the safety and efficacy the diet drug, and failed to inform and did conceal from Plaintiffs, the public and physicians these material facts.

146.    Defendants fraudulently, intentionally and/or negligently misrepresented to Plaintiffs, Plaintiffs' physicians, the FDA, and the general public that Diet Drugs were safe and effective, that the benefits of taking the drug outweighed any risks, and/or fraudulently, intentionally and/or negligently misrepresented and concealed safety and effectiveness information regarding the product, including but not limited to the drug's propensity to cause serious physical harm when used alone and in combination. The continuous and ongoing course of action constituting fraud and misrepresentation on Plaintiffs started as early as 1992, if not earlier, and continued through repeated acts and non-disclosure every year since then throughout the United States and elsewhere.

147.    Diet Drugs were in fact unsafe and the use of Diet Drugs posed a risk of injury and death which outweighed the purported benefits of its use, such that injury was in fact caused to Plaintiffs and others.

148.    Defendants made misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Diet Drugs had defects, dangers, and characteristics that were other than what Defendants had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including Plaintiffs.    Specifically, Defendants misrepresented to and/or actively concealed from Plaintiffs' prescribing physicians or other dispensing entities, the FDA, and the consuming public the following:

    a.    It was dangerous to prescribe the drug;

    b.    Diet Drugs were not intended for cosmetic weight-loss;

    c.    The drug carried risks of serious adverse effects;

    d.    After discontinuing use, most users of the drug would regain any weight lost as a result of its use;

    e.    There had been insufficient studies regarding the safety and efficacy of the drug for use in treating weight loss;

    f.    Despite knowing that there had been insufficient or inadequate testing of the drug, Defendants marketed, promoted and/or sold the drugs as if it was fully and adequately tested;

    g.    That prior studies, research, reports and/or testing had been conducted linking the use of the drug or similar drugs, to serious adverse reactions, including, but not limited to, primary pulmonary hypertension, heart valvular disorders, and neurological disorders;

    h.    The fact Defendants knew, or should have known of twenty-five (25) cases of heart-valve damage reported in Belgium and/or elsewhere in Europe related to the drug or similar drugs;

    i.    The fact that Defendants knew or should have known of the greatly increased risk of developing primary pulmonary hypertension as reported in the International Primary Pulmonary Hypertension study, as well as a great number of reports of the disorder related to the drugs' use; yet, despite this Defendants downplayed the risk of developing this fatal disease and under-reporting the known number of cases reported to Defendants of persons who had contracted the disorder after ingesting Diet Drugs;

    j.    The fact that Defendants knew or should have known the results of studies on animals showing a substantial loss of serotonin nerve axons in the brains of monkeys after being exposed to the drug as well as medical studies regarding evidence of neurotoxicity and other health hazards from the use of the drug yet misrepresented to Plaintiffs and others that the drug was safe and effective;

49

k.   The results of studies on animals, which revealed marked abnormalities in the cardiac and/or pulmonary tissues of these animals following diet drug ingestion;

l.   The safety and efficacy of Diet Drugs in labeling, advertising, product inserts, promotional materials, or other marketing efforts;

m.   The number of deaths that had been associated with Diet Drugs, the number of cases of heart valve damage associated with the drug, the number of cases of primary pulmonary hypertension associated with the drug, and the fact that the drug had been associated with pulmonary hypertension;

n.   That the Diet Drugs were more or less effective than a placebo in achieving its intended purpose, i.e., weight loss; and

o.   The nature and extent of any beneficial health effect use of the Diet Drugs would provide the user.

149.    The misrepresentations and active concealment alleged above were perpetuated directly and indirectly by the Defendants.

150.    The fraudulent misrepresentations of Defendants took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of Diet Drugs.

151.    Defendants knew or should have known that these representations were false or misleading at the time they were made or omitted or concealed, and made the representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely on them, leading to the use of the Diet Drugs by Plaintiffs.

152.    At the time of Defendants' fraudulent misrepresentations, Plaintiffs and Plaintiffs' physicians were unaware of the falsity of the statements being made and believed them to be true.

50

Plaintiffs and Plaintiffs' physicians had no knowledge of the information concealed and suppressed by Defendants.

153.    Plaintiffs and Plaintiffs' physicians justifiably relied on and were induced by the misrepresentations and active concealment and relied on the absence of safety information which Defendants did suppress, conceal or fail to disclose to Plaintiffs' detriment.

154.    Interneuron had a post-sale duty to warn Plaintiffs and or Plaintiffs' physicians about the potential risks and complications associated with Diet Drugs in a timely manner.

155.    The misrepresentations and active concealment by Defendants constitute a continuing tort.

156.    Defendants made the misrepresentations and actively concealed this information with the intention and specific desire that Plaintiffs, Plaintiffs' prescribing physicians or other dispensing entities and the consuming public would rely on such or the absence of information in selecting Diet Drugs as treatment for weight loss.

157.    As a direct and legal result of the affirmative misrepresentations and fraudulent concealment of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or neurological system and other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, as well as all costs of this action.

## COUNT V
## BREACH OF IMPLIED WARRANTIES

158.    Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

159.    When the Defendants placed the drugs into the stream of commerce, they knew of the use for which the drugs were intended (as diet aids and weight loss medications) and impliedly warranted to the Plaintiffs that use of the diet drugs was a safe and acceptable means of weight loss and weight control.

160.    Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of said Defendants and upon all applicable implied warranties including but not limited to the implied warranty that the drugs were of merchantable quality and fit for use for weight loss and weight control.

161.    The drugs were not of merchantable quality and were not safe or fit for their intended use, but, rather, were unreasonably dangerous and unfit for the ordinary purposes for which they were used.

162.    Said drug products breached all applicable implied warranties because they were unduly dangerous in expected use and because they caused undue injury to the Plaintiffs.

163.    As a direct and proximate result of said Defendants' breach of these warranties, Plaintiffs have sustained serious and permanent injuries and damages including, but not limited to, injuries to the heart, pulmonary system and/or neurological system and other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of

hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

**COUNT VI**
**G.L. c. 93A UNFAIR AND DECEPTIVE PRACTICES**

164.    Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

165.    Defendants were at all times material hereto engaged in the conduct of trade and commerce throughout the United States including the Commonwealth of Massachusetts and the States within which Plaintiffs were prescribed and ingested the Diet Drugs

166.    Defendants engaged in trade and commerce with respect to the design, manufacture, approval, marketing, promotion, distribution and sale of Diet Drugs.

167.    Defendants, in furtherance of its business of trade and commerce, did knowingly and willfully engage in a wrongful scheme to conceal from Plaintiffs individually and by and through their physicians information about the risks associated with the ingestion of Diet Drugs.

168.    In furtherance of this scheme, Defendants made misleading statements and failed to disclose information to Plaintiffs individually and by and through their physicians concerning Diet Drugs in its marketing, promotion, distribution, and sale.

169.    Defendants knew the facts concerning Diet Drugs were material to Plaintiffs and their physicians in assessing the safety of Diet Drugs. Defendants also knew that withholding this information would place Plaintiffs at further risk of injury.

170.    Defendants made these misrepresentations and failed to disclose material facts for the purpose of inducing Plaintiffs to purchase and ingest Diet Drugs, thereby making Diet Drugs

profitable to Defendants, and knowing that were the information properly divulged, Diet Drugs would likely be subject to lost earnings and further regulation or withdrawal from the market.

171.    Plaintiffs relied to their detriment on Defendants' representations that Diet Drugs was an effective and relatively risk free diet drug.

172.    As a result of their reliance and as a direct and proximate cause of Defendants' willful or knowing unfair or deceptive acts or practices, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or neurological system and other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature.

173.    Defendants' actions in furtherance of its wrongful scheme to prevent disclosure of accurate and sufficient information about the true risks of pulmonary hypertension, VHD and other injuries constitute unfair and deceptive acts and practices as defined in G.L. c. 93A.

174.    Defendants knowingly and willfully engaged in these unfair and deceptive acts and practices.

175.    Defendants' unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts because, among other things: Defendants' principal place of business is in Lexington, Massachusetts and at all relevant times Defendants and its officials were conducting business in Massachusetts when they engaged in unfair and deceptive acts and practices; and Defendants committed said unfair and deceptive acts in marketing, promoting, distributing, detailing, and/or selling Diet Drugs to the public, including Plaintiffs.

176.   Plaintiffs have substantially complied and/or will comply with all requirements of

G.L. c. 93A, § 9.

177.   Plaintiffs have pursuant to Massachusetts G.L. c. 93A sent to Interneuron and

Boehringer a letter of demand for settlement.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, as well as all

costs of this action.

PLAINTIFFS CLAIM A TRIAL BY JURY.

PLAINTIFFS
By their attorneys

Edward J. Barshak, (BBO No. 032040)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030


Neil D. Overholtz
Aylstock, Witkin & Sasser, P.L.C.
55 Baybridge Drive
P.O. Box 1147
Gulf Breeze, FL 32562-1147
(850) 916-7450


DATED: April 20, 2004

55

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                    SUPERIOR COURT DEPARTMENT
                                                 CIVIL ACTION NO.

| | |
|---|---|
| **IN RE MASSACHUSETTS STATE COURT DIET DRUG LITIGATION** | **Civil Action No. 00-9999-G** |
| | 04-1675 |
| **BARNELL CAPERS, MARY GRUBBS, LIBBY HEAD, and DONNA WOOTEN,** | |
| Plaintiffs | |
| v. | |
| **Indevus Pharmaceuticals, Inc., F/K/A Interneuron Pharmaceuticals, Inc.; Wyeth, Inc., F/K/A American Home Products Corporation; Wyeth Pharmaceuticals, Inc F/K/A Wyeth-Ayerst Pharmaceuticals, Inc., A Division Of American Home Products Corporation; and Boehringer Ingelheim Pharmaceuticals, Inc.,** | |
| Defendants | |

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE

APR 2 0 2004

CLERK

4/20/04
(date)
Brassard J., Motion
allowed                denied
Attest:
Deputy            Asst. Clerk

### MOTION FOR APPOINTMENT
### OF SPECIAL PROCESS SERVER

Now come the plaintiffs in the above-captioned matter and move that this Court

appoint Constables Philip D. Fixman, Michael B. Fixman and Daniel P. Kochakian of

Michael B. Fixman & Associates (disinterested parties and over the age of eighteen), 72

Hancock Street, P.O. Box 83, Everett, Massachusetts or a representative thereof, as

Special Process Server, for the purpose of serving any and all process served in this case, including but not limited to the Complaint.

_Edward J. Barshak_

Edward J. Barshak, (BBO No. 032040)
Michael S. Appel, (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030


Neil D. Overholtz
Aylstock, Witkin & Sasser, P.L.C.
55 Baybridge Drive
P.O. Box 1147
Gulf Breeze, FL 32562-1147
(850) 916-7450

DATED: April 20 , 2004